UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


ANGIODYNAMICS, INC.,           )
        Plaintiff              )
                               )
                v.             )    C.A. No. 09-cv-30181-MAP
                               )
BIOLITEC, INC., ET AL.,        )
        Defendants             )


MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT
PURSUANT TO RULES 12(b)(2) AND 12(b)(6)
(Dkt. No. 13)

July 25, 2011

PONSOR, D.J.

## I.    INTRODUCTION

This case arises out of a Supply and Distribution

Agreement in which Defendant Biolitec, Inc. ("BI"), a

subsidiary of Defendant Biolitec AG ("BAG"), agreed to

defend and indemnify Plaintiff AngioDynamics, Inc. against

all third-party patent infringement claims arising out of

the marketing and distribution of Defendants' products.

Plaintiff alleges that, when Defendants learned of the steep

cost of defending Plaintiff against such claims, Defendant

BAG looted Defendant BI, draining more than $18 million out

of the company and undermining its ability to defend

Plaintiff.  Plaintiff brings claims for, <u>inter alia</u>, tortious interference with contract, and fraudulent transfer in violation of Mass. Gen. Laws ch. 109A.

Defendants now move to dismiss Plaintiff's claims under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (Dkt. No. 13.)  For the reasons stated below, Defendants' motion will be denied.

## II.   <u>FACTUAL BACKGROUND</u>

### A.   <u>The Parties</u>.

Plaintiff AngioDynamics, Inc. is a Delaware corporation with a principal place of business in New York.  Plaintiff specializes in the manufacture and sale of medical devices.

Defendant BI is a New Jersey corporation with a principal place of business in East Longmeadow, Massachusetts.  Defendant BI is closely held corporation; ninety percent of its stock is owned by Defendant BAG, a German corporation headquartered in Germany.  The remaining ten percent is owned by Kelly Moran and Carol Morello, who were officers of BI from 1989 through 2009.  Moran served as Vice President and COO from 1995 through 2008, and Morello

served as Secretary and Treasurer from 1989 through 2009. Additionally, they both served as directors of the company, along with Defendant Wolfgang Neuberger.[1]

Defendant Neuberger is a citizen of Austria and resides in various locations around the globe. He is President, CEO, and Chairman of the Board of both Defendant BI and Defendant BAG. Through his holding company, Defendant Biomed Technology Holdings Ltd. (of which he is sole owner), Defendant Neuberger owns just under seventy-five percent of stock in Defendant BAG. He also owns one hundred percent of the stock of the following entities, which were the alleged recipients of the looted funds at issue here: Biolitec Pharma Marketing, Ltd.; CeramOptec GmbH; Biolitec Pharma, Ltd.; and Biolitec SIA.

B.    The Formation and Alleged Breach of the SDA.

---

[1] Moran and Morello have filed three separate complaints of their own against Defendants in a New Jersey state court and in two Massachusetts state courts. (See Dkt No. 20, Exs. A, B, & C.) In reciting the facts of this case, Plaintiff relies on allegations contained in those three verified complaints filed by Moran and Morello and has attached them to the First Amended Complaint in this case, contending that the state-court complaints are "in effect sworn affidavits." (Dkt. No. 20, Pl.'s Mem. in Opp'n at 2 n.2.)

3

In April 2002, Defendant BI entered into a Supply and Distribution Agreement ("the Agreement") with Plaintiff. Under the Agreement, Plaintiff was given exclusive distribution rights within Canada and the United States to certain Biolitec products, including lasers and optical fibers used for the treatment of varicose veins.

The Agreement required Defendant BI to defend and indemnify Plaintiff against third-party patent infringement claims arising from "the manufacture, marketing, sale, distribution, and use" of the above-mentioned products. (Dkt. No. 7, Am. Compl. ¶ 41.)  Plaintiff alleges that, before entering into the Agreement, Defendants BI, Neuberger, and BAG had been aware that two competitors -- Diomed, Inc. and VNUS Medical Technologies, Inc. -- owned similar patents and that litigation would likely ensue.

On January 6, 2004, Diomed filed suit against Plaintiff alleging patent infringement.  Plaintiff notified Defendant BI, which assumed defense of the action.

On October 12, 2005, VNUS also sued Plaintiff, on the same grounds.  Plaintiff again notified Defendant BI, but this time, Plaintiff alleges, Defendant BI refused to take

on the defense.

Defendant BI paid for the defense of the Diomed case until the jury returned an unfavorable verdict on March 28, 2007, at which time Defendant BI renounced its obligation to pay for further defense and refused to indemnify Plaintiff. Plaintiff appealed the Diomed verdict and eventually settled with Diomed, at its own expense, for $7 million. Plaintiff later litigated the VNUS action, also at its own expense, and settled with VNUS in 2008 for $6.8 million, plus ongoing royalty payments.

C.   <u>The Alleged Looting of Defendant BI.</u>

Plaintiff alleges that Defendant BAG "looted," <u>i.e.</u>, fraudulently removed assets from, Defendant BI in an amount exceeding $18 million between 2002 and 2009.  Plaintiff asserts that over $15 million in transfers were made after Diomed sued Plaintiff in 2004 and over $12 million in transfers were made after VNUS sued Plaintiff in 2005. Specifically, Plaintiff sets forth the following list of allegations:

- Defendant BAG issued more than $3.6 million in false and fraudulent invoices to Defendant BI, approximately $3.4 million of which was

invoiced after Diomed sued Plaintiff in 2004.

- Defendant BAG issued between $5 million and $7 million in improperly and fraudulently overbilled laser invoices to Defendant BI -- all dated from August 2006 forward, after the commencement of both infringement actions.

- Defendant BAG fraudulently charged Defendant BI approximately $5 million in "fees," of which $4 million date from March 2004 forward -- after the Diomed lawsuit.

- Defendant BAG imposed more than $400,000 in fraudulent interest charges on Defendant BI (almost all directly paid to Defendant BAG). The first of these charges was dated January 6, 2004 -- the exact date that Diomed filed its complaint against Plaintiff.

- Biolitec Pharma Marketing Ltd., an entity wholly owned by Defendant BAG, issued a $62,500 fraudulent invoice to Defendant BI on February 15, 2008.

- In March 2009, Defendant BAG transferred patents worth more than $1 million from Defendant BI to Biolitec Pharma Marketing Ltd. without any compensation in return and for no legitimate business purpose.

- In June 2009, Defendant BAG transferred the headquarters and factory of Defendant BI (worth over $1 million) to CeramOptec Industries, Inc., which is ninety-percent owned by Defendant BAG, for no consideration and no legitimate business purpose.

(Dkt. No. 20, Pl.'s Opp'n at 6-7; Dkt. No. 7, Amended Compl. ¶¶ 91-138.)

D. **The Alleged Tortious Interference by Defendants BAG and Neuberger.**

In the years after the signing of the Agreement, the relationship between Plaintiff and Defendants BAG and Neuberger (its CEO) became increasingly strained, according to Plaintiff.[2] Plaintiff alleges that Defendant BAG was fully aware of the Agreement between Plaintiff and Defendant BI, and Defendant BAG knowingly interfered with that contract by systematically depriving Defendant BI of resources needed to fulfill its obligations under the Agreement. Plaintiff alleges that it is now facing "the great likelihood that BI will be unable to satisfy any judgment [obtained against it]." (Dkt. No. 20, Pl.'s Opp'n at 14.)

### III. PROCEDURAL BACKGROUND

On January 2, 2008, Plaintiff commenced an action for breach of contract in the United States District Court for

---

[2] Disputes arose regarding Plaintiff's exclusive rights to distribute Defendants' products, and, in 2004, when Plaintiff was on the eve of printing a preliminary prospectus for its IPO, Defendants Neuberger and BAG allegedly attempted to revoke Plaintiff's exclusivity rights under the Agreement, knowing that it would negatively affect the IPO.

the Northern District of New York, alleging that Defendant BI had breached the Agreement by failing to fully defend and indemnify Plaintiff against patent infringement claims. On October 26, 2009, Plaintiff filed suit in this court against Defendants BI, BAG, Biomed, and Neuberger.

The First Amended Complaint contains five counts: (1) tortious interference with contract; (2) piercing the corporate veil; (3) declaratory judgment; (4) fraudulent transfer in violation of Mass. Gen. Laws ch. 109A; and (5) violation of Mass. Gen. Laws ch. 93A. Defendants now move to dismiss the entire complaint as to Defendant BAG for lack of personal jurisdiction and Counts 1, 2, and 5 for failure to state a claim upon which relief may be granted. (Dkt. No. 13.)

## IV. DISCUSSION

### A. Personal Jurisdiction (Fed. R. Civ. P. 12(b)(2)).

To establish personal jurisdiction over a defendant, the plaintiff bears the burden of showing by a preponderance of the evidence that jurisdiction exists. See Lechoslaw v. Bank of Am., N.A., 618 F.3d 49, 54 (1st Cir. 2010). On a motion to dismiss, courts must assess whether the plaintiff

has made a prima facie showing of personal jurisdiction.
Id. (noting that this inquiry asks "whether the plaintiff
has proffered evidence which, if credited, is sufficient to
support findings of all facts essential to personal
jurisdiction") (citation omitted).  In assessing the
sufficiency of this showing, the court must accept the
plaintiff's proffers of evidence as true where supported by
specific facts as set forth in the record.  See United
Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960
F.2d 1080, 1091 (1st Cir. 1992).  Personal jurisdiction is
established by demonstrating that: (1) the state's long-arm
statute authorizes jurisdiction; and (2) general due process
requirements are met.  Id.  In Massachusetts, the long-arm
statute is coextensive with the constitutional limits of the
Due Process Clause and, thus, it is appropriate to "sidestep
the statutory inquiry and proceed directly to the
constitutional analysis."  Daynard v. Ness, 290 F.3d 42, 52
(1st Cir. 2002) (citing Automatic Sprinkler Corp. of Am. v.
Seneca Foods Corp., 280 N.E.2d 423, 424 (Mass. 1972)).

The constitutional analysis considers, first, whether
Defendant has "sufficient minimum contacts with the state,

such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007) (citation omitted). These contacts with the state must be either related to Plaintiff's claim, thus creating specific jurisdiction, or they must be "continuous and systematic," thus creating general jurisdiction. Lechoslaw, 618 F.3d at 54 (citing Harlow v. Children's Hosp., 432 F.3d 50, 57 (1st Cir. 2005)). Second, in either instance, the defendant's contacts with the state must be purposeful. Id. Third, and finally, the exercise of jurisdiction must be "reasonable under the circumstances." Id. (citation omitted).

Here, Plaintiff proceeds under theories of both general jurisdiction and specific jurisdiction. As to the former, Plaintiff asserts that the court's undisputed authority to exercise general jurisdiction over Defendant BI -- a New Jersey corporation with a principal place of business in Massachusetts -- should be imputed to Defendant BAG on a piercing-the-corporate-veil theory.[3] For the reasons stated

_____

[3] At the outset, it is worth noting that this court addressed a similar issue in American Medical Sys., Inc. v. Biolitec, Inc., 604 F. Supp. 2d 325 (D. Mass. 2009) ("AMS"),

below, this court agrees.

A subsidiary's contacts with the forum state may be attributed to the parent corporation under a veil-piercing theory. <u>Negron-Torres v. Verizon Comm's, Inc.</u>, 478 F.3d 19, 26 (1st Cir. 2007). More commonly, plaintiffs use this theory to impute liability to parent entities for actions taken by a subsidiary. When invoked in the jurisdictional context, the inquiry remains the same. <u>Id.</u> ("[W]hile it is generally true that questions of liability and jurisdiction

in which a different plaintiff sought to impute the court's authority over Defendant BI to Defendant BAG on a veil-piercing theory. The court's decision in <u>AMS</u> is not controlling here for two reasons. First, <u>AMS</u> involved the application of federal law because it was a federal question case. <u>See id.</u> (applying the standard set forth in <u>United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.</u>, 960 F.2d 1080, 1091 (1st Cir. 1992), which requires a showing of "lack of corporate independence, fraudulent intent, and manifest injustice"). Here, where subject matter jurisdiction is premised on diversity of citizenship, the court must apply a materially different state law standard, which, as discussed in the text, does not require a showing of fraudulent intent, among other things. Moreover, in <u>AMS</u>, the plaintiffs apparently did not make any of the allegations that Plaintiff makes here in support of its veil-piercing theory. <u>See id.</u> ("At best Plaintiffs allege that Biolitec AG oversees and controls its subsidiaries and works with them to market products. None of this evidence indicates that Biolitec AG and Biolitec, Inc. enjoyed anything other than the traditional parent-subsidiary relationship . . . .").

are independent, the factors that we must consider for purposes of piercing the veil separating two corporations in the liability context also inform the jurisdictional inquiry.") (citation and quotation marks omitted).

In Massachusetts, there is a "presumption of corporate separateness," which may be overcome only in rare situations.  Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 129 (1st Cir. 2006).  "The mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent . . . ."  Id. (citation omitted).  In the seminal case of My Bread Baking Co. v. Cumberland Farms, Inc., 233 N.E.2d 748, 752 (Mass. 1968), the Massachusetts Supreme Judicial Court ("SJC") set forth a two-pronged test for determining when a plaintiff may pierce the corporate veil:

> (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various

corporations and their respective representatives
are acting.

Id. (emphasis added).  More recently, the SJC refined this

test by establishing twelve factors[4] for courts to consider:

> (1) common ownership; (2) pervasive control; (3)
> confused intermingling of business assets; (4) thin
> capitalization; (5) nonobservance of corporate
> formalities; (6) absence of corporate records; (7)
> no payment of dividends; (8) insolvency at the time
> of the litigated transaction; (9) siphoning away of
> corporation's funds by dominant shareholder; (10)
> nonfunctioning of officers and directors; (11) use
> of the corporation for transactions of the dominant
> shareholders; and (12) use of the corporation in
> promoting fraud.

Attorney Gen. v. M.C.K., Inc., 736 N.E.2d 373, 380 n.19

(Mass. 2000).  The analysis of these factors does not

involve merely counting those favoring veil-piercing and

those against it; a court must "examine[ ] the twelve

factors to form an opinion whether the over-all structure

and operation misleads."  Evans v. Multicon Const. Corp.,

574 N.E.2d 395, 400 (Mass. App. Ct. 1991) (piercing

corporate veil when four factors favored veil-piercing and

_____

[4] The parties cite nine factors originally set forth by
the First Circuit in Pepsi-Cola Met. Bottling Co. v.
Checkers, Inc., 754 F.2d 10 (1st Cir. 1985), which was later
expanded in Attorney Gen. v. M.C.K., Inc., 736 N.E.2d 373,
380 n.19 (Mass. 2000).  The nine Pepsi factors are identical
to factors four through twelve in text.

eight opposed it).

Here, Plaintiff asserts that Defendant BAG, at the behest of its controlling shareholder, Defendant Neuberger, fraudulently siphoned more than $18 million out of its subsidiary, most of which was transferred _after_ Diomed and VNUS instituted their infringement actions. As set forth in the above statement of facts, these transfers were allegedly made under the guise of "fees" and "invoices." Plaintiff asserts that the transfers had no legitimate business purpose and that Defendant BI received nothing in return. Rather, Plaintiff submits, their sole purpose was to deprive Defendant BI of the resources necessary to fulfill its contractual obligations under the defense and indemnity provisions of the Supply and Distribution Agreement.

Defendants challenge the veracity of these allegations, labeling them "deficient," "simply unsupportable," and "riddled with factual errors." (Dkt. No. 23, Defs.' Reply at 14-15.) Defendants maintain that these transfers are individually explainable and cumulatively do not amount to the nefarious course of conduct alleged in the complaint. However, at this stage in the litigation, the court must

accept Plaintiff's allegations as true. See Adelson v.
Hananel, 510 F.3d 43, 50 (1st Cir. 2007) ("[U]nder the prima
facie standard, [the plaintiff's] evidence is accepted as
true and all inferences are drawn in favor of his
jurisdictional claim."). Viewed in this light, the
complaint contains powerful, highly detailed allegations of
corporate misconduct, including fraud. These allegations,
if true, describe a shocking pattern of corporate looting
sufficient to satisfy several of the factors set forth by
the SJC. Undoubtedly, Plaintiff's claims involve the
confused intermingling of business assets (fraudulent
invoices for fictional goods and services),[5] thin
capitalization (Defendant BI is allegedly unable to fulfill
its defense and indemnity obligations), siphoning the

---

[5] Defendants correctly point out that Plaintiff has not
presented any allegation that it was actually confused about
the defendant entities, which unquestionably reduces the
force of this factor. See Platten v. HG Bermuda Exempted
Ltd., 437 F.3d 118, 129 (1st Cir. 2006) ("Despite their
allegations of intermingling, plaintiffs have never alleged
that they were confused about the identity of the legal
entity with which they were contracting.")(emphasis in
original). Yet, while it scores a point for Defendants,
this argument does not affect the outcome of the analysis,
as it represents only a minor element in Plaintiff's many
veil-piercing allegations.

subsidiary's funds, using the subsidiary for transactions of the parent, and using the subsidiary to promote fraud.

These allegations alone would likely justify piercing Defendant BAG's corporate veil.  See Rivera v. Club Caravan, Inc., 928 N.E.2d 348, 354 (Mass. App. Ct. 2010) (noting that the allegation that a parent entity was "siphoning off significant corporate resources" by itself would have created a basis for veil-piercing if not for the plaintiff's failure "to develop the point adequately to send the issue to the jury"); Birbara v. Locke, 99 F.3d 1233, 1241 (1st Cir. 1996) (vacating jury verdict in which jury held parent liable for actions of subsidiary and highlighting plaintiff's failure to present evidence of "financial misconduct of the subsidiary involving such manipulation as asset-stripping or asset-siphoning, which depleted the resources of the subsidiary") (citation omitted).[6]  But

---

[6] Defendants rely on Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118 (1st Cir. 2006) for the contrary proposition, but this reliance is misplaced.  Although Defendants suggest that Platten establishes a bright-line rule that siphoning corporate assets is not sufficient to pierce the corporate veil, Platten contains no such language, and the above-cited case law makes clear that this is a fact-specific inquiry.  Moreover, the plaintiff in Platten merely alleged that "surplus profits earned by [the

Plaintiff's allegations do not end here.

Plaintiff notes that Defendant BAG owns ninety percent of Defendant BI, and Defendant Wolfgang Neuberger is President, CEO, and Chairman of the Board of <u>both</u> Defendant BI and Defendant BAG. In addition, through his holding company, Biomed Technology Holdings Ltd. (of which he is sole owner), Defendant Neuberger is the majority shareholder of Defendant BAG. The alleged systematic looting of Defendant BI by its parent corporation, as allegedly overseen and directed by Defendant Neuberger, demonstrates Defendant Neuberger's ability and willingness to manipulate the operations of the subsidiary. Moreover, when Defendant Neuberger learned of the litigation instituted in 2009 by COO Moran and Secretary/Treasurer Morello -- the only other officers and directors of Defendant BI -- he immediately eliminated them from Defendant BI's management team. Thus, common ownership and pervasive control are readily apparent in this case.

Plaintiff further asserts that Defendant BI held no

---

subsidiary] 'are siphoned upward to the Partnership for distribution to the partners as bonuses,'" making it plainly inapposite. <u>Id.</u> at 128 (emphasis added).

board meetings from its 1989 inception until July 2009, when Moran and Morello were removed from the board. The failure to hold board meetings clearly constitutes the nonobservance of corporate formalities, leads to an absence of corporate records, and prevents directors from adequately fulfilling their designated roles.

In short, the complaint sets forth a textbook example of the "rare situation[ ]" in which disregard of the corporate form is warranted. Platten, 437 F.3d at 127. Although this analysis does not require merely tallying up the factors for and against piercing the corporate veil, it is particularly noteworthy that Plaintiff's allegations here satisfy almost every factor presented by the SJC, with the possible exceptions of non-payment of dividends and insolvency. Of course, the analysis of jurisdiction is not intended to suggest that success on the merits is inevitable. As noted, Defendants vigorously attack Plaintiff's allegations, and Plaintiff carries the burden of proving them. At this stage, however, Plaintiffs have more than satisfied their burden of making a prima facie showing that the exercise of jurisdiction is warranted on a veil-

piercing theory.

The jurisdictional inquiry contains one additional element.  The exercise of jurisdiction must be "reasonable under the circumstances," or, in other words, comport with "traditional notions of fair play and substantial justice." Lechoslaw v. Bank of Am., N.A., 618 F.3d 49, 54 (1st Cir. 2010).[7]  To evaluate reasonableness, courts must apply the following so-called "Gestalt" factors:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

Cossaboon v. Maine Med. Ctr., 600 F.3d 25, 33 n.3 (1st Cir. 2010).  Applying these factors, Defendants argue: (1) Defendant BAG, as a German corporation, is burdened by appearing in Massachusetts; (2) Massachusetts does not have

---

[7] The court notes that the due process analysis also requires a showing that the defendant's contacts with the forum state were "purposeful."  Here, however, the "purposeful" element is no longer in play because Defendant BI's contacts with Massachusetts are indisputably "purposeful" (operating out of the Commonwealth), and those contacts will be imputed to Defendant BAG.

a strong interest in litigating a dispute between a New York and a German corporation; (3) obtaining a judgment in Massachusetts against a German corporation is not the most effective way to resolve the controversy; and (4) both Massachusetts and Germany have an interest in avoiding this kind of international dispute.

Plaintiff responds that (1) Defendant BAG is already litigating a case in Massachusetts state court, thus minimizing the burden of appearing here; (2) Massachusetts has a strong interest in the case because violations of state law are at issue; (3) the disposition of Massachusetts' real estate (Defendant BI's headquarters and facilities) is at issue; and (4) Plaintiff would be unable to obtain "convenient and effective relief" if it was forced to litigate the case in Germany.

Both parties' arguments have some force. Certainly, requiring a foreign defendant to appear in a United States court creates a burden for that individual or entity. Nonetheless, in this case such considerations are not sufficient to overcome Plaintiff's strong prima facie showing of general jurisdiction on a veil-piercing theory.

As Plaintiff observes, "BAG purposefully availed itself of the privilege of conducting activities in Massachusetts when it fraudulently removed $16.5 million in Massachusetts-held assets that its Massachusetts-based subsidiary had accumulated while doing business in Massachusetts."[8]  (Dkt. No. 25, Pl.'s Sur-Reply at 13.)  As such, the exercise of jurisdiction over Defendant BAG does not offend "traditional notions of fair play and substantial justice."  Lechoslaw, 618 F.3d at 54.

In conclusion, jurisdiction exists, and this court will exercise it.

B.    Failure to State a Claim (Fed. R. Civ. P. 12(b)(6)).

1.    Count 1: Tortious Interference with Contract.

Under Massachusetts law, a claim for contractual interference has four necessary elements: "(i) the existence of a business relationship, (ii) of which the defendant is aware and (iii) with which the defendant intentionally and

_____

[8] Such allegations may also satisfy the requirements of specific jurisdiction, which involves a "material connection" between the plaintiff's claims and the defendant's contacts with the forum state.  Platten, 437 F.3d at 138.  However, the court need not decide this issue given that general jurisdiction has been so clearly established.

improperly interferes, (iv) causing impairment of the relationship to the plaintiff's detriment." <u>Kouvchinov v. Parametric Tech. Corp.</u>, 537 F.3d 62, 70 (1st Cir. 2008). The third element requires the plaintiff to establish improper conduct, "which may include ulterior motive (e.g., wishing to do injury) or wrongful means (e.g., deceit or economic coercion)." <u>Luciano v. Coca-Cola Enters., Inc.</u>, 307 F. Supp. 2d 308, 323 (D. Mass. 2004) (citation omitted).

Here, it is undisputed that Plaintiff and Defendant BI had a business relationship, that the other parties were aware of that relationship, and that Plaintiff suffered detriment, which, it alleges, was directly attributable to Defendants' actions. In support of their motion to dismiss, Defendants rely primarily on the argument that Plaintiff has failed to show improper motive. Defendants correctly observe that, in the context of a parent allegedly interfering with the contract of a subsidiary, Plaintiff must demonstrate that the parent acted with "actual malice," meaning "malevolence, spite or ill will." <u>See Charles River Data Sys., Inc. v. Oracle Complex Sys. Corp.</u>, 788 F. Supp. 54, 59 (D. Mass. 1991) ("[A] parent corporation is

privileged to 'interfere' with the contractual business of
its subsidiary . . . provided the privileged defendants act
with the purpose of protecting their legitimate economic
interests, and without actual malice directed toward the
plaintiff.").

Plaintiff responds by pointing to the breakdown of
relations between Defendant Neuberger and Plaintiff and
highlighting its core allegation that Defendants siphoned
millions of dollars out of Defendant BI, knowing full well
that Plaintiff would be relying on Defendant BI's financial
backing throughout the impending lawsuits.  At this stage in
the litigation, these allegations are sufficient to overcome
Defendants' Rule 12(b)(6) motion.  See Powderly v. MetraByte
Corp., 866 F. Supp. 39, 43-44 (D. Mass. 1994) (denying
motion to dismiss tortious interference claim where
plaintiff alleged that the parent corporation "mismanaged
[its subsidiary's] business, mischarged expenses and
diverted revenues, with the deliberate purpose of depriving
him of his bonus").

   2.   Count 2: Piercing the Corporate Veil.

   Under Count 2, Plaintiff seeks to hold Defendants

liable for any judgment obtained by Plaintiff in the New
York action against Defendant BI by piercing the corporate
veil.  On this count, Defendants simply incorporate by
reference their earlier objections to Plaintiff's veil-
piercing allegations, as the standard remains the same in
this context.  See Negron-Torres v. Verizon Comm's, Inc.,
478 F.3d 19, 26 (1st Cir. 2007).  Accordingly, the court
will deny Defendants' motion on this count for the reasons
stated above.[9]

   3.   Count 5: Chapter 93A.

   Chapter 93A provides a cause of action to "a person who
is engaged in business and who suffers a loss as a result of
an unfair or deceptive act or practice by another person

───────────────

   [9] Defendants note in passing that it is not clear
whether Massachusetts imposes a heightened burden on
plaintiffs seeking to pierce the corporate veil in a breach-
of-contract action as opposed to a tort action, and they
argue that this court should resolve the issue in their
favor.  See Birbara, 99 F.3d at 1238 (stating that "several
courts and commentators have suggested that it should be
more difficult to pierce the veil in a contract case than in
a tort case," highlighting the absence of relevant authority
in Massachusetts, and ultimately declining to resolve the
issue); Platten, 437 F.3d at 129 n.7 (same).  Given that
this is a motion to dismiss and the fact that the parties
have not briefed the issue, it is unnecessary and
inappropriate to render a decision at this time.

also engaged in business." <u>Manning v. Zuckerman</u>, 444 N.E.2d 1262, 1264 (Mass. 1983) (citing Mass. Gen. Laws ch. 93A, § 11). Chapter 93A requires that the unfair or deceptive trade practice must have occurred "primarily or substantially" in Massachusetts. Mass. Gen. Laws ch. 93A, § 11.

Defendants argue, first, that as a "simple breach of contract," this case does not fall under the purview of Chapter 93A. <u>See</u> <u>Incase Inc. v. Timex Corp.</u>, 488 F.3d 46, 56 (1st Cir. 2007) ("Simple breach of contract is not sufficiently unfair or deceptive to be alone a violation of Chapter 93A."). Under Count 4, however, Plaintiff alleges the fraudulent transfer of assets in violation of Mass. Gen. Laws ch. 109A, and Chapter 93A certainly encompasses fraud. <u>See</u> <u>Slaney v. Westwood Auto, Inc.</u>, 322 N.E.2d 768, 779 (Mass. 1975) ("[T]he definition of an actionable 'unfair or deceptive act or practice' goes far beyond the scope of the common law action for fraud and deceit.").

Next, Defendants argue that the conduct at issue here did not occur primarily or substantially in Massachusetts. This inquiry "looks to whether the center of gravity of the

circumstances that give rise to the claim is primarily and substantially within the Commonwealth." <u>Uncle Henry's, Inc. v. Plaut Consulting Co.</u>, 399 F.3d 33, 44 (1st Cir. 2005). The burden is on Defendants to prove that such actions did not occur in-state. <u>See</u> Mass. Gen. Laws ch. 93A, § 11.

As discussed extensively above, this case centers on the allegation that Defendants fraudulently transferred funds out of a Massachusetts-based entity and into a number of foreign corporations. This allegation is sufficient to overcome the motion to dismiss. Although further factual development may reveal that much of the alleged misconduct in fact occurred outside the Commonwealth, dismissal at this stage is plainly improper.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's Complaint Pursuant to Rules 12(b)(2) and 12(b)(6) is hereby DENIED. The clerk will refer the matter to Magistrate Judge Neiman for a Rule 16 status conference.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge