UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ANGIODYNAMICS, INC.                )
        Plaintiff          )
                             )
                             )
         v.                 ) C.A. NO. 09-cv-30181-MAP
                             )
BIOLITEC AG,                       )
WOLFGANG NEUBERGER,                )
BIOLITEC, INC., and                )
BIOMED TECHNOLOGY HOLDINGS, LTD.)
        Defendants         )

MEMORANDUM AND ORDER REGARDING
EMERGENCY MOTION FOR RECONSIDERATION
OF PRELIMINARY INJUNCTION ORDER
(Dkt. No. 144)

December 14, 2012

PONSOR, U.S.D.J.

## I. INTRODUCTION

This case arises out of a Supply and Distribution

Agreement in which Defendant Biolitec, Inc. ("BI"), a

subsidiary of Defendant Biolitec AG ("BAG"), agreed to

defend and indemnify Plaintiff AngioDynamics, Inc. against

any third-party patent infringement claims arising out of

the marketing and distribution of Defendants' products.  In

separate (now successful) litigation before a federal judge

in the Northern District of New York, Plaintiff charged

that, when Defendants learned of the steep cost of defending Plaintiff against such claims, they failed to honor their promise and abandoned Plaintiff.

In this litigation, Plaintiff charges that Defendant BAG looted Defendant BI, draining more than $18 million out of the company.  This fraudulent transfer of funds had the effect of undermining BI's ability to defend and indemnify Plaintiff <u>and</u> rendered BI judgment-proof against any judgment Plaintiff might obtain against BI for breaking its promise.  Plaintiff's claims before this court include, <u>inter alia</u>, tortious interference with contract, piercing the corporate veil, fraudulent transfer in violation of Mass. Gen. Laws ch. 109A, and unfair and deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, § 11.

Defendants initially moved to dismiss Plaintiff's claims under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  (Dkt. No. 13.)  On July 25, 2011, this court denied Defendants' motion. (Dkt. No. 53.)

In August 2012, Plaintiff became aware that Defendant BAG was planning a merger with its Austrian subsidiary.

Plaintiff filed for a preliminary injunction to prevent
Defendant BAG from completing the merger.  Plaintiff alleged
that the merger would place the company's assets out of its
reach, as American judgments are unenforceable in Austria.
On August 29, Judge Rya W. Zobel ordered entry of the
preliminary injunction in the form requested by Plaintiff,
pending a further hearing by the undersigned.

On September 13, 2012, following a hearing, this court
itself reaffirmed the preliminary injunction as previously
entered by Judge Zobel.  The injunction had the effect of
forestalling BAG's planned merger until the court entered a
final judgment in this case.  At the September 13 hearing,
this court noted that Defendants could file a motion for
reconsideration or for an evidentiary hearing.  The current
Motion for Reconsideration (Dkt. No. 144) was promptly filed
by Defendants.  For the reasons stated below, Defendants'
motion will be denied.

## II. <u>BACKGROUND</u>

In its memorandum and order on Defendants' motion to
dismiss, this court laid out the detailed relationship among
the parties.  <u>AngioDynamics, Inc. v. Biolitec, Inc.</u>, 2011 WL

3157312, *1-2 (D. Mass. July 25, 2011).  Since this ruling,
several events have enriched the factual environment.

First, in the last sixteen months, the federal district
court for the Northern District of New York granted summary
judgment, on the question of liability, in favor of
AngioDynamics and against Defendant BI, the American
subsidiary of BAG.  BI was obligated to provide
reimbursement of settlement and defense costs that
AngioDynamics incurred defending itself in patent
infringement litigation.  Some months later, the New York
court entered judgment against BI, on the question of
damages, in favor of AngioDynamics in the amount of
$16,463,846.94 plus pre-judgment interest.  (Dkt. No. 157,
Reynolds Decl. 1-2.)

After the grant of summary judgment in the New York
action, Plaintiff became aware that Defendant BAG, BI's
parent company, planned to complete a merger with its
Austrian subsidiary entity, Biolitec
Unternehmensbeteiligungs I AG ("BUIAG").  Defendant BAG set
a shareholders' meeting for August 30, 2012, to vote on the
proposed merger of BAG into BUIAG.  Following the proposed

4

merger, BUIAG would hold all assets and liabilities
previously held by BAG, and shareholders in BAG would have
their shares converted into shares of BUIAG.  BAG publicly
announced that the 75% ownership share of CEO Wolfgang
Neuberger (also a defendant in this action) in BAG
guaranteed that his plan would be approved by a majority of
the shareholders.

On August 29, 2012, as noted above, Judge Zobel granted
Plaintiff's Motion for a TRO and Preliminary Injunction to
bar this merger.  The injunction restrained Defendants from:

- "carry[ing] out the proposed 'downstream
  merger' of Biolitec AG with its Austrian
  subsidiary;

- "alienat[ing], dispos[ing] of, sell[ing]
  dissipat[ing], encumber[ing], or otherwise
  transfer[ing] any ownership interest it holds
  in any other defendant during the duration of
  this Order; and

- "alienat[ing], dispos[ing] of, sell[ing]
  dissipat[ing], encumber[ing], or otherwise
  transfer[ing] any interest it may have in any

property during the duration of this Order,

except that this Order shall not preclude the

defendants from taking such actions as are

reasonable and necessary to the ongoing and

continued operation of the business of

Biolitec, Inc., Biolitec AG, and Biomed

Technology Holdings, Ltd. in the ordinary

course of business, including the payment of

reasonable attorneys' fees for the provision

of legal services; and except that this Order

shall not apply to the reasonable and

necessary personal and living expenses of

defendant Wolfgang Neuberger.

(Dkt. No. 126.)  The injunction further restrained, with

exceptions, Defendants' use of their property pending a

further order of the court.

On September 6, 2012, defense counsel informed the

court that, despite Judge Zobel's order, Defendant BAG had

proceeded with the shareholders' meeting and vote. (Dkt. No.

133 ¶ 5.)  Defendants did not inform the minority

shareholders of the TRO. (Dkt. No. 136-1, Sept. 10, 2010

Reynolds Decl. ¶ 11.)  The vote in favor of the merger passed by a wide margin.

The convening of the shareholders' meeting, despite the preliminary injunction, raised troubling questions about Defendants' good faith.  Before Judge Zobel, Defendants had argued passionately that the injunction requested by Plaintiff would <u>bar</u> the shareholders' meeting, with catastrophic results for BAG.  Indeed, this was Defendants' primary line of argument in opposing Plaintiff's motion and demonstrating irreparable harm to them.  Despite this, as soon as Judge Zobel's order entered, Defendant BAG proceeded with the supposedly forbidden shareholders' meeting in any event.

When counsel appeared before this court on September 13, 2012, for argument on whether Judge Zobel's order should be extended, Defendants entirely reversed their position regarding the shareholders' meeting.  Now they argued that Judge Zobel's order did not, in fact, prohibit the shareholders' meeting or the vote in favor of the merger, because "neither the meeting nor the vote resulted in the 'carrying out' of the merger or the 'alienation, exchange,

7

disposal, sale, dissipation, encumbering, or other transfer'
of any ownership interest in Biolitec AG or any other
defendant." (Dkt. No. 133 ¶ 4.)  Defendants contended that
the merger, though voted on, would not in fact be carried
out until it was approved by German and Austrian courts and
recorded in the companies' official registers. (Dkt. No. 133
¶ 4.)  Plaintiff challenged the actions of Defendant BAG, as
the vote "committ[ed] the company to the very action that
this Court has specifically enjoined, and mov[ed] that
action forward toward completion." (Dkt. No. 136, Pl.'s
Suppl. Memo. 12.)

      Regardless of the substantive effect of the
shareholders' vote -- it appears that, despite the vote, the
formal merger of BAG into the Austrian entity has not yet
occurred -- Defendants' about-face is disturbing.  To
foretell dire consequences if an injunctive order issues, in
order to persuade a judge not to issue the order, and then
simply proceed with no negative consequences whatsoever
after the order issues, is not the most credible way to
oppose a motion for preliminary injunction or to reassure a
court as to a party's good faith.

On September 13, 2012, after hearing oral argument, this court reaffirmed the preliminary injunction entered by Judge Zobel. (Dkt. No. 141.)  This court's rationale for this ruling may be summarized as follows.

First, at the hearing Plaintiff demonstrated a likelihood success on the merits.  As noted, AngioDynamics now has a verdict well in excess of $16,000,000 against Defendant BI.  Strong evidence, including an insider affidavit, supported Plaintiff's contention that Defendant BAG looted assets from BI in order to insure that BI would be judgment-proof.  It is conceded by Defendants that the transfers from BI to BAG have in fact had this effect: BI now lacks the assets to pay the judgment Plaintiff obtained in the Northern District of New York.  Based on this conduct, it is likely that Plaintiff will eventually obtain a judgment in this court against both BI and BAG, as well as the other Defendants.

Second, Plaintiff demonstrated irreparable harm that will flow from the proposed merger.  Under German law, Plaintiff has a fair chance of enforcing an American judgment against BAG.  The task of doing this may be

formidable, but it is not impossible.  Under Austrian law,
the parties agree that it would be flatly impossible to
enforce any American judgment against BAG.  Once the merger
occurs moving all of BAG's assets from Germany to Austria,
any further litigation in this court against BAG would be
pointless.  Since BI now appears to be judgment-proof,
Plaintiff is primarily looking to BI assets held by BAG to
satisfy the judgment of the New York federal court.  The
merger would place BAG assets utterly out of Plaintiff's
reach.

Third, the balance of harm strongly favors Plaintiff.
The inconvenience suffered by BAG in postponing its merger
for a few months while this case is resolved amounts to very
little in comparison with the harm Plaintiff would suffer in
losing any opportunity to recover against BAG.

At the September 13 hearing, the court, as noted,
entertained oral argument only, based on extensive written
submissions.  During argument, Defendants' counsel made
reference to factual materials not before the court to
oppose Plaintiff's motion and suggested that an evidentiary
hearing might persuade the court to withdraw the preliminary

injunction.  In light of these representations, the court's September 13 ruling was entered without prejudice to a request for reconsideration, with further written submissions and possible oral testimony.

On September 18, 2012, Defendants moved for reconsideration of the preliminary injunction and requested an evidentiary hearing. (Dkt. No. 144.)  On November 20, 2012, the court once more heard argument on the question of whether the preliminary injunction should stand or, alternatively, whether Defendants were entitled to an evidentiary hearing.  For the reasons set forth below, the court will decline to reconsider the preliminary injunction. Moreover, since nothing in an evidentiary hearing has any prospect of altering the court's ruling, the court will also deny Defendants' request for a hearing.

### III. <u>DISCUSSION</u>

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

<u>Winter v. Natural Resources Defense Council</u>, 555 U.S. 7, 20 (2008).  As laid out below, a series of undisputed facts provide sufficient support for Plaintiff's motion for preliminary injunction.

A. <u>Undisputed Facts relating to the Injunction</u>.

At the risk of repetition, the following facts are clear.  First, Plaintiff has obtained a judgment of over $20 million (including interest) against co-Defendant BI for breach of contract related to the reimbursement of settlement and defense costs from patent infringement lawsuits.  BI is now insolvent, and Defendants concede that BI does not have sufficient resources to satisfy the judgment granted to AngioDynamics.

Second, Defendants BAG, Wolfgang Neuberger, and Biolitec Medical Holdings, Ltd., moved substantial monies from BI during the time when the New York litigation was pending.  While the purpose of these transfers is disputed, neither party disputes that assets were moved out of BI to BAG and other related entities.

Third, if Defendant BAG is allowed to shift its assets to Austria, this litigation would become pointless.  Both

parties agree that U.S. judgments in commercial matters cannot be enforced in Austria.

Fourth, enforcing a judgment in Germany may be difficult but it is not impossible.

Finally, Plaintiff has provided the sworn affidavit of a corporate insider, Stefan Spaniol, which directly confirms that Neuberger diverted assets from BI to BAG and other related entities with the specific intent to thwart collection of the American judgment obtained by Plaintiff against BI in the Northern District of New York.  While the Spaniol declaration is not beyond impeachment, it is rare to have such a powerful insider statement supporting a plaintiff in a fraud case.

Under these circumstances, all of the preliminary injunction factors strongly favor Plaintiff.

B.  <u>Preliminary Injunction Factors</u>.

1. <u>Likelihood of Success on the Merits</u>.

To establish a likelihood of success on the merits, the district court must only determine the "probable outcomes." <u>Jimenez Fuentes v. Torres Gazambide</u>, 807 F.2d 236, 238 (1st Cir. 1986).  In the First Circuit, the movant's likelihood

13

of success is particularly important in determining whether a preliminary injunction is proper. <u>See</u>, <u>e.g.</u>, <u>Cohen v. Brown Univ.</u>, 991 F.2d 888, 903 (1st Cir. 1993); <u>Lancor v. Lebanon Housing Auth.</u>, 760 F.2d 361, 362 (1st Cir. 1985).

Here, the parties have yet to finish discovery. However, both sides have drawn on affidavits, documents shared in discovery, and depositions. Also, to Plaintiff's chagrin, Defendants have occasionally relied on documents that have yet to be shared with Plaintiff in discovery.[1]

For each claim "the burdens at the preliminary injunction stage track the burdens at trial." <u>Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal</u>, 546 U.S. 418, 429 (2006). Here, Plaintiff has five claims for relief. Only two of these counts -- piercing the corporate veil and fraudulent conveyance -- provide claims for equitable relief that would justify a preliminary injunction. Plaintiff is likely to succeed on several of its claims of fraudulent conveyance. The piercing the corporate veil claim is more

---

[1] As Plaintiff pointed out, Defendants have been less than forthcoming in discovery and have been subject to successful motions to compel. (Dkt. No. 171, Pl.'s Sur-Reply 16.)

complex, but even on this claim, Plaintiff has provided
substantial evidence to bolster its allegations -- notably
the Spaniol declaration confirming the fraud.  At this
stage, it is enough that Plaintiff has demonstrated
likelihood of success on at least some of its claims.

> a. <u>Fraudulent Conveyance</u>.

The Massachusetts fraudulent transfer statute gives
creditors access to relief against transfers which meet the
statutory definition as fraudulent:

> (a) A transfer made or obligation incurred by a
> debtor is fraudulent as to a creditor, whether the
> creditor's claim arose before or after the transfer
> was made or the obligation was incurred, if the
> debtor made the transfer or incurred the obligation:
> (1) with actual intent to hinder, delay, or defraud
> any creditor of the debtor.

Mass. Gen. Laws ch. 109A, § 5.

The First Circuit has recognized that "[i]t is often
impracticable, on direct evidence, to demonstrate an actual
intent to hinder, delay, or defraud creditors."  <u>Max
Sugarman Funeral Home, Inc. v. ADB Investors</u>, 926 F.2d 1248,
1254 (1st Cir. 1991).  The First Circuit has set out five
factors to assess:

> (1) actual or threatened litigation against

15

> the debtor; (2) a purported transfer of all or
> substantially all of the debtor's property; (3)
> insolvency or other unmanageable indebtedness
> on the part of the debtor; (4) a special
> relationship between the debtor and the
> transferee; (5) retention by the debtor of the
> property involved in the putative transfer.

ADB Investors, 926 F.2d at 1254.  The confluence of several of these factors can "constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose."  ADB Investors, 926 F.2d at 1254-55; see also FDIC v. Anchor Props., 13 F.3d 27, 32 (1st Cir. 1994).

Defendant BI satisfies all these criteria, on largely undisputed evidence.  As to the first factor, actual or threatened litigation, actual litigation against Defendant BI by Plaintiff was first filed in New York in January 2008. (Dkt. No. 7-1, Am. Compl. Ex. A.)  The action before this court was filed in October 2009. (Dkt. No. 1, Pl.'s Compl.) The patent infringement litigation against AngioDynamics -- for which BI was contractually obligated to indemnify AngioDynamics -- began in 2004.

On the second factor, purported transfer of all or substantially all of debtor's property, the tax records of

16

Defendant BI show that its assets have decreased from $24,985,600 in 2008 to $10,899,835 in 2011.  In 2011, BI also reported $15,761,133 in "intercompany debt" to other Biolitec group companies. (Dkt. No. 136-4, Sept. 10, 2010 Reynolds Decl. ¶ 2, Ex. A, B.)  This history provides strong support of substantial transfers.

The third factor, insolvency, is largely undisputed. BI has had "poor economic results" according to Defendants' declarations. (Dkt. No. 118-1, Meyersie Decl. ¶ 19). Defendants' accountants indicated that BI could be subject to a "going concern qualification." (Dkt. No. 111-2, Aug. 21, 2012 Reynolds Decl. Ex. C.)[2]

Fourth, the transfers in question were all to entities that had a special relationship with BI.  All of the entities are part of the Biolitec group of companies.  Defendant Neuberger remains the CEO and

---

[2] Defendants spend much of their briefing explaining that BI's poor performance since 2008 is due to the poor management of the former Chief Operating Officer and mounting legal bills.  (See, e.g., Dkt. No. 162, Defs.' Reply 5-6.)  However, the First Circuit's test does not ask whether there is a justifiable insolvency.  Instead, thin capitalization or insolvency -- regardless of reason -- is one of several factors that is weighed to determine whether a fraudulent transfer should be inferred.

dominant shareholder of debtor and all transferees.

Finally, because the transfers are all between Neuberger-controlled entities, the debtor has retained the property that was transferred, the fifth indicia of a fraudulent transfer.  Many of the transfers in question involve a change in legal title but no change in the location of assets.  Defendants created holding companies and simply recharacterized debt.  Defendants have not sold assets or debt to third parties but have instead transferred assets and liabilities within their family of companies.

In sum, Plaintiff has made out the <u>prima</u> <u>facie</u> case for fraudulent conveyance.  None of these factors alone would necessarily indicate a fraudulent transfer.  But taken together these factors should "constitute conclusive evidence of an actual intent to defraud."  <u>ADB Investors</u>, 926 F.2d at 1255.

Given this showing, the burden shifts to Defendants to show "significantly clear evidence of a legitimate supervening purpose."  <u>ADB Investors</u>, 926 F.2d at 1255. Defendants argue, incorrectly, that Plaintiff's failure to

come forward with evidence of specific fraudulent transfers
is fatal to its request for preliminary relief.  This
argument misapprehends the allocation of the burden, which
Defendants, not Plaintiff, must bear once an initial
showing is made based on the <u>ABD Investors</u> factors.

It is true the Defendants have provided some
documentation for many of the disputed transfers.  However,
much of the documentation sets out the amounts of the
transfers and the parties involved but gives little
information about the purpose of the transfers or whether
fair consideration was given.  As spelled out below, on
several of the fraudulent conveyance claims, Defendants
have failed to provide significant evidence of a legitimate
supervening purpose as required by Massachusetts law.  Some
examples make this clear.

- Sale of patents to a sister company.

In their complaint, Plaintiff alleged that Defendant
BAG transferred patents worth more than $1 million from BI
to Biolitec Pharma Marketing Ltd. (which is solely owned by
BAG) without any compensation in return and for no
legitimate business purpose in March 2009.  Plaintiff's

insider, Stefan Spaniol, stated in his declaration that
Wolfgang Neuberger specifically talked with him about
removing patents from the United States to protect them
from potential U.S. judgments.

Defendants provided the declaration of BI CFO Art
Henneberger to explain many of the transfers and provide
documentation about the costs.  In the patent context,
Henneberger stated that BAG decided to consolidate the
ownership of patents and other intellectual property in the
Group's Malaysian affiliate.  The invoices for the transfer
are provided and BI received over $1 million in exchange
for the patents.

This information falls far short of "significantly
clear" evidence of a legitimate supervening purpose.  While
consolidation of patents may have some legitimate purpose
in theory, the transfer may have also been done to place
all of the patents in a jurisdiction, Malaysia, where they
could not be reached by creditors.  More significantly, the
bare invoices provide no evidence that the amount paid to
BI was fair consideration for the assets.

- Allocation of Overhead Expenses to Foreign

20

Subsidiaries

Plaintiff alleged that Defendants allocated overhead expenses to BI, its American subsidiary, that were not charged to other foreign subsidiaries.  The Spaniol declaration supports this allegation.[3]  Defendants contended that these overhead costs are for research and development and general administration.  Defendants claimed that they started charging BI for overhead costs only when "the US market had reached a level of maturity that would enable the US subsidiary to bear a portion of the overhead expenses on a regular basis without undue effect on further market development."  (Dkt. No. 144-3, Henneberger Decl. ¶ 15.)  In the last fiscal year, the company has, for the first time, begun charging overhead costs to other foreign subsidiaries in the Middle East, Ireland, and Italy.

---

[3] "[Neuberger] also specifically talked with me about imposing overhead charges and/or corporate cross-charges from Biolitec AG onto Biolitec, Inc. for the purpose of pulling money out of Biolitec, Inc.  Neuberger specifically discussed with me that these charges were not being equally imposed on all other subsidiary entities that were located outside of the United States.  As an executive of the Biolitec group, I saw that these overhead charges were in fact imposed on Biolitec, Inc. and did in fact deplete the assets of Biolitec, Inc." (Dkt. No. 123-1, Second Spaniol Decl. ¶ 4.)

On the issue of allocating overhead, however,
Defendants have not provided any standard, uniformly
applied, formula for determining overhead expenses.
Indeed, Defendant BI's CFO Henneberger testified in another
case that he did not know what the formula was, if it had
ever actually been utilized, or what it included.  BI's
accountants have also raised issues about the allocation of
corporate charges to BI and requested "assurance that these
costs are allocated to all subsidiaries/related parties."
(Dkt. No. 136-7 at 11.)

In sum, the record is devoid of documentation showing
how a determination was made as to the timing and amount of
overhead cost allocations.  At this stage, a significantly
clear legitimate reason for the transfer has not been
presented.

• Pricing on urology lasers

Plaintiff also alleged that Defendants unjustifiably
increased the price they charged BI for urology lasers from
$25,000 to $50,000 in 2006.  Defendants conceded that the
price doubled in 2006, but they argued that the cost to
manufacture the lasers was close to $25,000 and it made

22

sense to sell the lasers to BI for $50,000 given that BI sold the same lasers retail for $87,500 to $100,000.

Defendants have attached emails and invoices which show that Kelly Moran, the COO of BI at the time, was aware of this increased price and continued to purchase a large number of lasers (including one invoice in October, 2006, in which BI ordered 60 lasers at $50,000 each). Defendants now claimed that the US market for the lasers had matured to a point where BAG could charge BI more for the wholesale lasers.

The email exchanges between Moran and Neuberger, which Defendants rely on heavily, actually show that Moran questioned the charge of $50,000 and recommended using a billing number that more accurately represented the cost. The email exchange also noted that the cost was around $25,000. The final decision on price was made by Defendant Neuberger despite the protests from BI. There is nothing in the email exchange that sets out the rationale for the price increase as "market maturation." At the hearing on this motion, Plaintiff also provided invoices for the same urology lasers that were being sold to the American

subsidiary BI for $50,000 and to a European subsidiary for
€25,000 on the same day.

• Challenged Invoices including FOSCAN Consulting
  Charges

Plaintiff alleged that Defendant BAG issued $3,668,192
in false and fraudulent invoices to BI.  Approximately $3.4
million (93.1 %) of these were issued starting March 29,
2004 -- after Plaintiff was sued in 2004 for patent
infringement.  Plaintiff pointed out that Defendants have
only attempted to explain one category of these invoices --
charges for FOSCAN consulting -- which only accounted for
only $1.26 million of the challenged invoices.  Plaintiff
also questioned the legitimacy of the FOSCAN consulting
charges.

Defendants explained that BI was attempting to obtain
FDA approval for FOSCAN, a pharmaceutical used in
conjunction with the Company's laser medical procedure.
Defendants argued that Biolitec Pharma (Ireland) Limited
was the company responsible for developing and testing
FOSCAN.  Defendants contended that BI paid Biolitec Pharma
to provide consulting services on FDA approval.  Defendants

24

provided a consulting agreement and invoices.  BI paid
Biolitec Pharma $50,000 per month between July 1, 2006, and
June 30, 2008, for consulting services.

Again, this evidence is weak.  The consulting
agreement presented by Defendants was neither signed nor
dated.  It is not clear when this document was produced or
if this was the agreement that governed the contract.

These four examples amply demonstrate the likelihood
that Plaintiff has to succeed on its fraudulent transfer
claims.  Plaintiff points to transfers detrimental to BI in
many other areas -- intercompany debt, interest charges,
Neuberger's salary and personal loans from BI, and legal
expenses.  It is unnecessary for the court to address these
other areas at this time.  It is clear that Defendants'
efforts fall short of providing significantly clear
evidence of a legitimate supervening purpose as required by
ADB Investors.

b. Piercing the Corporate Veil.

In the seminal case of My Bread Baking Co. v.
Cumberland Farms, Inc., 233 N.E.2d 748, 752 (Mass. 1968),
the Massachusetts Supreme Judicial Court ("SJC") set forth

25

a two-pronged test for determining when a plaintiff may

pierce the corporate veil:

> (a) when there is active and direct participation
> by the representatives of one corporation,
> apparently exercising some form of pervasive
> control, in the activities of another <u>and</u> there is
> some fraudulent or injurious consequence of the
> intercorporate relationship, <u>or</u> (b) when there is
> a confused intermingling of activity of two or
> more corporations engaged in a common enterprise
> with substantial disregard of the separate nature
> of the corporate entities, or serious ambiguity
> about the manner and capacity in which the various
> corporations and their respective representatives
> are acting.

<u>Id.</u> (emphasis added).  More recently, the SJC refined this

test by establishing twelve factors (referred to by the

parties as the "<u>Pepsi</u> factors") for courts to consider:

> (1) common ownership; (2) pervasive control; (3)
> confused intermingling of business assets; (4)
> thin capitalization; (5) nonobservance of
> corporate formalities; (6) absence of corporate
> records; (7) no payment of dividends; (8)
> insolvency at the time of the litigated
> transaction; (9) siphoning away of corporation's
> funds by dominant shareholder; (10) nonfunctioning
> of officers and directors; (11) use of the
> corporation for transactions of the dominant
> shareholders; and (12) use of the corporation in
> promoting fraud.

<u>Platten</u>, 437 F.3d at 128 (quoting <u>Attorney Gen. v. M.C.K.,</u>

<u>Inc.</u>, 736 N.E.2d 373, 380 n.19 (Mass. 2000)).  The analysis

of these factors does not involve merely counting the ones favoring veil-piercing and the ones against it; a court must "examine[ ] the twelve factors to form an opinion whether the over-all structure and operation misleads." Evans v. Multicon Const. Corp., 574 N.E.2d 395, 400 (Mass. App. Ct. 1991) (piercing corporate veil when four factors favored veil-piercing and eight opposed it).

In its order denying Defendants' motion to dismiss, the court emphasized that "the complaint sets forth a textbook example of the 'rare situation[]' in which disregard of the corporate form is warranted." AngioDynamics, Inc. v. Biolitec, Inc., 2011 WL 3157312, *6 (D. Mass. July 25, 2011). The court found it "particularly noteworthy that Plaintiff's allegations here satisfy almost every factor presented by the SJC, with the possible exceptions of non-payment of dividends and insolvency." Id.

In its filings in support of the motion for preliminary injunction, Plaintiff added several new pieces of evidence. Most notably, Plaintiff presented the declaration of Stefan Spaniol, the former Managing Director

27

of CeramOptec GmbH, the primary manufacturing entity of the
Biolitec Group, and former member of the executive board at
BAG.  In his declaration, Spaniol confirmed many of
Plaintiff's allegations that Neuberger intended to move
assets out of BI to make it incapable of paying any
judgment awarded to AngioDynamics.

Piercing the corporate veil is often a difficult claim
to make out.  As the First Circuit has noted, Massachusetts
law sets up a "presumption of corporate separateness,"
which may be overcome only in rare situations.  Platten v.
HG Bermuda Exempted Ltd., 437 F.3d 118, 129 (1st Cir.
2006).  But here Plaintiff has continued to provide
evidence that supports its initial allegations.  At this
stage, Plaintiff is not required to demonstrate a certainty
of success, only a probability.  The quantum of evidence
offered is sufficient to reach this level on the count
seeking to pierce the corporate veil.  Defendants have been
able to do no more than dilute a few of Plaintiff's claims
-- many of which still tend to show that BAG unjustifiably
diverted substantial assets from BI during the relevant
time period.

28

2. <u>Irreparable Harm</u>.

The merger would mean that BAG would cease to exist and its assets and liabilities would become the property of BUIAG in Austria.  As noted, the merger to the subsidiary in Austria would make enforcement of a judgment against BAG simply impossible.  As both parties concede, "U.S. judgments in commercial matters cannot be recognized or enforced in Austria." (Dkt. No. 136-2, Baumgartner Decl. ¶ 4.)

Defendants do not argue that it would be possible to enforce a judgment in Austria.  Instead, they contend that AngioDynamics would also face the same impossible burden of re-litigating its substantive tort claims in a German enforcement proceeding. (Dkt. No. 144, Defs.' Mot. Reconsideration 2.)

Both sides have submitted extensive materials from European law academics and practitioners on this issue.  In this blizzard of submissions, two points remain clear: (1) allowing BAG to shift assets to Austria would make this litigation pointless, as enforcement in Austrian courts is not possible; and, (2) enforcing a judgment against BAG in

Germany might (or might not) be difficult but it is not
impossible.  In other words, there is some chance of
enforcing this court's judgment in Germany, but no chance
in Austria.  Plaintiff would be irreparably harmed if the
court allowed BAG to transfer its assets to Austria.

    3.  Balance of Harm.

    The balance of harm also favors Plaintiff here.
Plaintiff stands to lose its entire case if BAG transfers
its assets to Austria.  In comparison, BAG stands to lose
very little by holding off on the merger until after this
litigation is completed.[4]

    Defendants have pointed to some business reasons for
the move -- more favorable corporate tax and labor laws, a
move to a preferred stock exchange listing, and proximity
to a growing market in Eastern Europe and Russia.  However,
not all of these reasons justify moving the headquarters
and assets of BAG into BUIAG.  BAG no longer has any
employees and already maintains a regional office in
Austria that deals with the Eastern European market. (Dkt.
No. 123, Pl.'s Reply Mem. 3, 5.)  Indeed, Defendants had

---

[4] At this time, trial is scheduled for June 2013.

successfully increased their sales in Eastern Europe by approximately 370% in one year while BAG headquarters were located in Germany. (Dkt. No. 118-3, Sagnak Decl. ¶ 5.)

Two of the business reasons for the move do seem to be threatened by the preliminary injunction: the stock classification move to the Entry Standard segment and tax advantages for BAG assets.  But on both accounts, Defendant BAG does not appear to be faced with an irreparable injury. When the injunction is lifted, the company can proceed with the merger at that time.  Plaintiff stands to lose their entire case plus possible enforcement of their New York judgment if the merger occurs.  Defendants merely face a delayed realization of a business opportunity.  The harm to Plaintiff emphatically outweighs the harm to Defendants.

4.  <u>Public Interest</u>.

Finally, an injunction is in the public interest. Plaintiff has obtained a judgment against Defendant BI in the Northern District of New York.  Defendants concede that BI cannot satisfy that judgment.  If BAG and the other Defendants have illegitimately looted assets from BI, the assets of the other Defendants should be available to Plaintiff to satisfy its judgment.  Preserving the status

quo to maintain the possibility of enforcement is in the public interest.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Defendants' motion for reconsideration and for an evidentiary hearing (Dkt. No. 144) is hereby DENIED.  The case will proceed, subject to the injunction, in accordance with the scheduling order previously entered.

It is So Ordered.

<u>/s/ Michael A. Ponsor</u>
MICHAEL A. PONSOR
U. S. District Judge