UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANGIODYNAMICS, INC., | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | C.A. No. 09-cv-30181-MAP |
| | ) | |
| BIOLITEC, INC., BIOLITEC AG, | ) | |
| BIOMED TECHNOLOGY HOLDINGS LTD., | ) | |
| and WOLFGANG NEUBERGER, | ) | |
| Defendants | ) | |

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' AMENDED MOTION FOR RELIEF FROM
CONTEMPT ORDER; DEFENDANTS' MOTION FOR RECUSAL, AND
DEFENDANTS' MOTION TO VACATE PRELIMINARY INJUNCTION
(Dkt. Nos. 269, 274, 277)

August 27, 2013

PONSOR, U.S.D.J.

I. INTRODUCTION

Defendants Biolitec AG ("BAG"), Biomed Technology

Holdings Ltd. (Biomed"), and Wolfgang Neuberger[1] have filed

a motion for relief from the contempt order issued against

them (Dkt. 269), a motion for recusal (Dkt. 274) and a

motion to vacate the preliminary injunction (Dkt. No. 277)

---

[1] Defendant Biolitec, Inc. has filed for Chapter 11
bankruptcy, and the contempt proceedings do not involve this
defendant.

issued by this court.  This injunction, affirmed on appeal
by the First Circuit, barred Defendants from proceeding with
a merger of BAG, a German corporation, with its Austrian
subsidiary.  For the reasons set forth below, all these
motions will be denied.

## II. <u>FACTS</u>

The complex background underlying this litigation has
been detailed in a number of prior decisions.
<u>AngioDynamics, Inc. v. Biolitec, Inc.</u>, 2011 WL 3157312, *1-2
(D. Mass. July 25, 2011); <u>AngioDynamics, Inc. v. Biolitec
AG</u>, 910 F. Supp. 2d 346 (D. Mass. 2012).  The facts
supporting the court's civil contempt order and its referral
of the case to the United States Attorney for possible
initiation of charges for criminal contempt are set forth at
length in the order of April 11, 2013.  <u>AngioDynamics, Inc.
v. Biolitec AG</u>, --- F. Supp. 2d ----, 2013 WL 1567739 (D.
Mass. Apr. 11, 2013).  The journey of this case has been
somewhat tortuous, but the rulings on Defendants' three
motions do not require a lengthy re-hashing, beyond, as will
be seen, a few basic facts.

This phase of the dispute largely centers on the

preliminary injunction issued by this court on September 13, 2012.  (Dkt. No. 141.)  The order enjoined Defendants from "carry[ing] out the proposed 'downstream merger' of [BAG] with its Austrian subsidiary."  (Id.)  The injunction was upheld on reconsideration by this court and, as noted, upon subsequent appeal to the First Circuit.  AngioDynamics, Inc. v. Biolitec AG, 910 F. Supp. 2d 346 (D. Mass. 2012); AngioDynamics, Inc. v. Biolitec AG, 711 F.3d 248 (1st Cir. 2013).  On March 15, 2013, Defendants notified the court that, in the teeth of the injunction, they had knowingly and intentionally proceeded with the enjoined merger anyway, and it had been completed.  (Dkt. No. 199.)

On April 10, 2013, after a show cause hearing, the court ordered that Plaintiff's request for initiation of possible criminal contempt proceedings against the individual defendant Neuberger be referred to the United States Attorney's Office.  The court also found all Defendants in civil contempt and handed down an order designed to coerce Defendants into taking immediate remedial action to bring them into compliance with the preliminary injunction.  The court issued an arrest warrant for

Defendant Neuberger -- who had been invited to attend the show cause hearing to explain his actions but failed to appear -- to permit the court to consider appropriate civil sanctions against him personally.  In addition, the court established the following schedule of coercive fines intended to compel Defendants to initiate immediate action to return BAG to the status quo as it existed prior to the enjoined merger:

- On May 10, 2013, Defendants to be assessed a fine of $1 million;

- On June 1, 2013, Defendants to be assessed a fine of $2 million;

- On July 1, 2013, Defendants to be assessed a fine of $4 million;

- On August 1, 2013, Defendants to be assessed a fine of $8 million;

- After August 1, Defendants to be assessed a fine of $8 million on the first of each month.

AngioDynamics, Inc. v. Biolitec AG, 2013 WL 1567739, at *6. The court noted that the sanctions would be lifted as soon as the court was satisfied that effective actions had been

taken to revoke the forbidden merger and restore the status quo ante.  Id.  During the hearing, the court also observed that it would immediately consider any plan offered by Defendants to revoke, eliminate, or in any practical way render nugatory, Defendants' action in defying the court's order and proceeding with the merger.  In the event that the plan set Defendants on a clear course to erase the barred merger, the court possessed the power to revoke the sanctions.  (Dkt. No. 248, Tr. Contempt Hr'g 45:4-11.)

More than four months have now passed since the court's finding of contempt.  As will be seen below, Defendants appear to recognize that it would be possible, though cumbersome and somewhat time-consuming (a matter of months), to take action that would effectively reverse the merger. Nevertheless, Defendant Neuberger has not appeared, and no plan has been offered by Defendants even to begin to do this.  Instead, Defendants have filed a motion for relief from the contempt order (Dkt. No. 269), a motion for recusal (Dkt. No. 274), and a motion to vacate the preliminary injunction (Dkt. No. 277).

### III. DISCUSSION

A.   <u>Relief From the Contempt Order</u>.

Defendants ask the court to grant them "relief" from
the contempt order -- essentially, to revoke the order --
pursuant to Fed. R. Civ. P. 59(e), 60(b)(4), and  60(b)(6).

The request under Rule 59(e) may be quickly disposed
of.  A motion under this rule "must be filed no later than
10 days after the entry of judgment."  Fed. R. Civ. P.
59(e).  The court entered its civil contempt order on April
10, 2013; Defendants submitted their first motion for relief
(later amended) on May 9, 2013 -- four weeks after the
contempt order was entered and only one day before the fines
designed to coerce compliance were to commence.  The motion
is therefore untimely.  In addition, a movant invoking Rule
59(e) must show "manifest errors of law or fact, newly
discovered or previously unavailable evidence, manifest
injustice, [or] an intervening change in controlling law."
<u>Marie v. Allied Home Mortg. Corp.</u>, 402 F.3d 1, 7 n.2 (1st
Cir. 2005) (quoting 11 Charles Alan Wright & Arthur R.
Miller, <u>Federal Practice and Procedure</u> § 2810.1 (2d ed.
1995)).  As will be shown in the discussion regarding relief
under Rule 60, Defendants could not meet this burden even if

their motion under 59(e) was timely.

Pursuant to Rule 60, Defendants ask the court to provide relief for two reasons: (1) the judgment is void under Rule 60(b)(4); and (2) other reasons justify relief, Rule 60(b)(6).  It is well established that relief under Rule 60 is "extraordinary" and that "motions invoking that rule should be granted sparingly."  <u>Karak v. Bursaw Oil Corp.</u>, 288 F.3d 15, 19 (1st Cir. 2002).[2]  "At a bare minimum," the moving party must show "that his motion is timely; that exceptional circumstances exist, favoring extraordinary relief; that if the judgment is set aside, he has the right stuff to mount a potentially meritorious claim or defense; and that no unfair prejudice will accrue to the opposing parties should the motion be granted."  <u>Id.</u>

In an attempt to satisfy this standard, Defendants make three main arguments.  First, citing <u>In Re Providence Journal Co.</u>, 820 F.2d 1342, 1347 (1st Cir. 1986), Defendants

---

[2] The normal route for relief from a contempt order is to prosecute a timely appeal.  <u>Cf.</u> <u>Cotto v. United States</u>, 993 F.2d 274, 278 (1st Cir. 1993) (holding that relief pursuant to Fed. R. Civ. P. 60 cannot be used to circumvent the failure to make a timely appeal).  Defendants already appealed the civil contempt order to the First Circuit on May 10, 2013.  (Dkt. No. 266, Notice of Appeal.)

argue that the contempt order is "transparently invalid" because Defendants' violation of the preliminary injunction did not harm Plaintiff.  Second, Defendants contend that the civil contempt sanctions are improper because it is not possible for BAG to "restore the status quo ante."  Finally, Defendants insist that the court must make a determination on German law, as well as this law's potential impact upon Plaintiff's future efforts to enforce an American judgment against a now-Austrian corporation, before an enforcement of the preliminary injunction would be appropriate.  The failure to do this, Defendants say, vitiates the finding of contempt and the court's remedial order.

    1.   <u>Validity of the contempt finding</u>.

    The centerpiece of Defendants' position is the "no harm, no foul" argument.  Yes, Defendants say, we knowingly violated a clear court order, but since (as Defendants seem to suggest, but more about this below) Plaintiff has not been injured, imposition of any painful consequence for their defiance of the court's order would be unfair.  Defendants take umbrage at the court's characterization of

this argument as childish.[3]  The argument _is_ childish.  A
brief parable demonstrates why.

Suppose an eleven-year-old boy is preparing to throw a
snowball at his seven-year-old sister.  The parent notices
this and warns the boy not to throw the snowball.  The boy
nods, fully understanding the parent's injunction.  As the
parent begins to turn away, the boy throws the snowball at
his sister anyway.  Fortunately, the snowball misses.  When
the parent points out that there will be consequences for
this misbehavior, the child indignantly protests that this
would be unfair because his sister was not harmed.[4]

This "no harm" argument might be understandable coming
from a child, but in the mouth of an adult litigant, or a
supposed officer of the court, it is breathtakingly silly.

---

[3] They also express resentment that the court cut off oral
argument on this point and suggest the court did not
adequately consider it. As the transcript indicates, however,
the court "carefully considered" this argument, which was
"very forcefully and very clearly" set forth in Defendants'
memorandum, prior to oral argument  (Dkt. No. 233, Tr. Apr. 3
Hr'g 6:9, 14-5.)  It is not necessary for the court to endure
an obviously specious argument, or suffer counsel to embarrass
himself by presenting one, more than once.

[4] Defendants' argument here is even weaker than the
child's, since Defendants, as will be seen, have the power to
effectively undo the merger -- to call the snowball back.

The criteria in this circuit for issuance of a finding of

contempt are straightforward.  The court must find that:

> (1) the alleged contemnor had notice of the order,
> (2) the order was clear and unambiguous, (3) the
> alleged contemnor had the ability to comply with
> the order, and (4) the alleged contemnor violated
> the order.

Hawkins v. Dept. of Health & Human Servs., 665 F.3d 25, 31

(1st Cir. 2012) (internal quotations and citation omitted).

As the court has held, there was, and continues to be, clear

and convincing undisputed evidence conclusively satisfying

each of these requirements.  AngioDynamics, Inc. v. Biolitec

AG, 2013 WL 1567739, at *3-4.  Defendants, indeed, have

effectively conceded that each and every one of these four

criteria have been satisfied in this case.  As Defendants'

counsel admitted: "We violated the preliminary injunction by

completing the merger and it's absolutely clear that the

preliminary injunction said do not complete the merger."

(Dkt. No. 233, Tr. Apr. 3 Hr'g 24:25-25:1-2.)

Defendants, or at least their counsel, must know that

once an explicit court order is knowingly and intentionally

defied, and the snowball, so to speak, is nevertheless

thrown, the moral and legal stage on which the parties and

the court act changes substantially.  The drama ceases to be only about the Plaintiff; it now bears as much, or more, on the issue of the court's authority and the integrity of the legal system.  Any judge confronting flagrantly contumacious conduct of this sort must either act or take off the robe.

Defendants cite a Fourth Circuit decision that includes language suggesting that in some cases a civil contempt order might include as part of its basis a finding that the "movant suffered harm as a result [of the contumacious conduct]."  Ashcraft v. Conoco, Inc., 218 F.3d 288, 301 (4th Cir. 2000).  This decision is not controlling on this court, of course; the Hawkins decision is.

More importantly, this court took care to address the "no harm" argument in its memorandum.  AngioDynamics, Inc. v. Biolitec AG, 2013 WL 1567739, at *4.  The court noted that the First Circuit has demanded that courts look only to the text of an order to determine what is forbidden by it. Goya Foods, Inc. v. Wallack Mgmt. Co., 290 F.3d 63, 76 (1st Cir. 2002).  The power of contempt makes this careful attention to the actual wording of an order, rather than exploration of its supposed inchoate "purpose," crucial.

-11-

Courts must narrowly cabin the circumstances in which contempt may be found by anchoring the finding on the words of the order. <u>United States v. Saccoccia</u>, 433 F.3d 19, 28 (1st Cir. 2005).  Here the text could not have been clearer about what behavior was forbidden.

If Defendants had any doubt as to what actions would violate the order, "[they] could have asked the district court for clarification . . ., but they eschewed that course.  They chose instead to rely on their own judgment . . . .  In so doing, [they] acted at their peril." <u>Goya Foods</u>, 290 F.3d at 75-76.  At argument, Defendants conceded that they deliberately did not confer with Plaintiff's counsel or notify the court before taking the supposedly harmless action of flouting the order.  (Dkt. No. 233, Tr. Apr. 3 Hr'g 23-4.)  Their reason for doing this was manifest: they knew they were violating the order and did not wish to give Plaintiff or the court notice of their intent.  Their contempt was knowing, intentional, and brazen.

But there is more.  Although it has no bearing on the principle embedded in this dispute, the court in fact found

-12-

that Plaintiff <u>would</u> <u>be</u> harmed by any merger and that
Plaintiff <u>has</u> <u>been</u> harmed now that the merger has taken
place.  In granting the original motion for preliminary
injunction, and in reconsidering the injunction, the court
was required to consider, and did consider, the issue of
likely harm to Plaintiff.

During argument in connection with reconsideration of
the preliminary injunction before this court, Defendants
made very nearly the same argument they are offering here:
that the merger of BAG with its Austrian sister corporation
would put Plaintiff in no worse a position than it was in
before the merger.  Plaintiff argued vigorously to the
contrary, pointing out that while enforcement of an American
judgment in a German court might present Plaintiff with some
difficulties, enforcement in Germany was not impossible,
whereas all parties conceded that enforcement of an American
judgment in Austria would be flatly impossible.  The court
agreed with Plaintiff's argument.

Some series of symbols in higher mathematics may depict
the difference between a proposition that might be true and
one that is utterly impossible, but common sense can draw

the distinction perfectly well without equations.  Plaintiff
demonstrated likelihood of harm.  This court found this
originally and found it on reconsideration, and the Court of
Appeals affirmed this finding.

Now that the merger has taken place, the stronger
evidence of record confirms that the harm, in fact, has
occurred more or less as predicted.  In other words, while
it does not matter that Plaintiff has been harmed -- in
light of the principle that valid court orders cannot be
flouted without consequences -- Plaintiff has, in fact, been
seriously harmed.  Defendants' argument that certain assets
remain in Germany (exactly what these may be is not
specified) and that the headquarters of this now-Austrian
corporation (a lightly staffed office) remain in Germany
cannot obscure the fact that the merger has put Plaintiff in
a substantially more difficult position in terms of
enforcing any judgment it might receive in this court.

It is significant that Defendants' arguments describing
some supposed independent justification for the merger,
apart from hamstringing Plaintiff, have never added up.
Stated differently, any rationale for the merger beyond

harming Plaintiff's potential enforcement efforts is a
fabrication.  Indeed, Defendant Neuberger's former
associate, Stefan Spaniol, has submitted an affidavit
confirming that Neuberger's intent in pushing forward with
the merger, conveyed to Spaniol explicitly, was specifically
to make enforcement of any judgment against BAG difficult if
not impossible.  (Dkt. No. 123-1, Second Spaniol Decl. ¶ 3.)

In sum, even if harm to Plaintiff were relevant, which
it is not, harm to Plaintiff flowing from the merger,
contrary to Defendants' arguments, has been found over and
over again.

It is well established that "[f]ederal courts are
empowered to issue civil contempt sanctions to 'protect[]
the due and orderly administration of justice . . . and
maintain [] the authority and dignity of the court.'"  Goya
Foods, 290 F.3d at 78 (alterations in original) (quoting
Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980)).
A coercive fine or term of imprisonment is an appropriate
civil contempt sanction if it is done to induce "the purging
of contemptuous conduct."  In re Kave, 760 F.2d 343, 351
(1st Cir. 1985).  Sanctions are coercive if they are

conditional and can be lifted if the contemptuous conduct is cured.  <u>Id.</u>  Here the sanctions are conditional and may be reconsidered when and if Defendants ever propose a plan for restoring the status quo prior to the merger.

Under these circumstances, Defendants are entitled to no "relief" from the court's order of contempt.  No exceptional circumstances exist under Rule 60 justifying reconsideration.  The supposed "transparent invalidity" of the court's order, based on the supposed lack of harm to Plaintiff, is nonsense.[5]

2.  <u>Impossibility of compliance.</u>

Defendants make four arguments why any remedial action it might take to undo the prohibited merger would be impossible: (1) it is "highly unlikely to be successful"; (2) it would take at least ten months to complete; (3) it

---

[5] Indeed, the decision Defendants rely on simply held: "A party subject to an order that constitutes a transparently invalid <u>prior</u> <u>restraint</u> <u>on</u> <u>pure</u> <u>speech</u> may challenge the order by violating it."  <u>In re Providence Journal Co.</u>, 820 F.2d at 1344 (emphasis added).  The First Circuit noted that this is an exception to the "sine qua non of orderly government, that, until modified or vacated, a court order must be obeyed."  <u>Id.</u>
Here, however, the First Circuit has held that the preliminary injunction at issue was valid.  Moreover, both the initial preliminary injunction and subsequent sanctions order impose no prior restraint on speech.

would possibly expose the board to breach of fiduciary duty claims under Austrian and German law; and (4) it might be contrary to Austrian law. (Dkt. No. 268, Am. Notice of Impossibility 2.)

None of these arguments holds water. Defendants contend only that remedial steps would be cumbersome, and both their German and Austrian law experts acknowledge that while the process would be lengthy, it would be possible.[6] (Dkt. No. 264-1, Zollner Decl. ¶ 5; Dkt. No. 264-4, Gebhardt Decl. ¶ 25.) Defendants' German law expert opines that it is "highly uncertain whether Biolitec AG could successfully relocate its corporate domicile to Germany." (Dkt. No. 264-4, Gebhardt Decl. ¶ 26.) This is artful equivocation, not a statement of impossibility. Defendants' ambiguous representations are especially suspect in light of the

---

[6] As noted previously in the contempt order, " It may indeed be impossible, as Defendants' counsel suggested, technically to 'rescind' the merger at this time. The court makes no finding on this point, beyond the observation that Defendants' general credibility about what it can or cannot do is subject to doubt. In any event, Defendants concede that restoring the status quo ante would in fact not be impossible, but merely lengthy, burdensome, and onerous. (Dkt. No. 233, April 3 Hearing Tr. 36.)" AngioDynamics, 2013 WL 1567739, at *5.

evidence, noted both by this court and by the First Circuit, of Defendants' past bad faith.  AngioDynamics, Inc., 711 F.3d at 250 n.1.

The claim of possible breach of fiduciary duty rings particularly hollow.  First, Defendant Neuberger owes this duty mostly to himself, since he owns or controls a great majority of the stock in both defendant corporations.  Second, it is hard to imagine any breach of fiduciary duty on the part of an officer of a corporation greater than behaving in such a way that a warrant is issued for his arrest for malfeasance and the corporation is exposed to monetary sanctions in the millions of dollars.  Re-working the merger is very small potatoes in comparison.

It is significant that at one point Defendants did in fact propose to delay the start of sanctions so Defendants could "propos[e] a plan to [Plaintiff] to start implementing" whatever efforts were necessary to put "the genie" "back into the bottle."  (Dkt. No. 248, Tr. Apr. 11 Hr'g, 47:2-8 & 44:20-23; see also AngioDynamics, 2013 WL 1567739, at *6 (extending the date from May 1 to May 10 for sanctions to begin, to permit discussions).)  No claim of impossibility was offered at that time.

Indeed, Defendants' counsel offered to come back to the
court with a specific plan of action to purge the contempt.
The court noted that it would not delay the sanctions until
a plan was submitted and vetted, but that it would allow
Defendants to submit a plan that could be vetted by
Plaintiff to ensure that Defendants' actions would result in
"effective and substantive compliance."  (Dkt. No. 248, Tr.
Apr. 11 Hr'g 40:15-22; 45: 4-11.)  No such plan has ever
been submitted.

Even now, if the court were convinced that a plan
submitted by Defendants were effectively aimed at remedying
the contempt, a motion to reduce or vacate the sanctions
would be considered.  (Id. at 46:7-19.)  The goal of this
court is not to punish Defendants gratuitously; the goal is
to obtain compliance with the court's order.

In sum, the argument that any effort to remedy
Defendants' violation of the preliminary injunction and
purge themselves from contempt would be impossible is not
supported by the record and lacks credibility.  The
"impossibility" argument does not justify "relief" from the
contempt order.

   3. German law.

The claim that the court must delve into the

intricacies of German law to support its finding of contempt requires little discussion.  Only two things need be said.

First, despite whatever disagreements may exist among the parties' experts, one thing is clear: the merger has placed Plaintiff in a more difficult position than it would have occupied had the merger never occurred.  Moreover, ample evidence exists to support the conclusion that this was Defendants' clear motive for proceeding with the merger. Other purported justifications are simply not credible.

Second, no investigation of German law can alter the fact that Defendants knowingly and intentionally flouted the court's order.  Once the court found a likelihood of harm and issued an injunction, Defendants were not entitled to ignore the order and then demand a renewed hearing on the issue of harm to avoid contempt.

In sum, the "German law" argument provides no basis for relief from the contempt order under Rule 60.

Accordingly, because none of Defendants' arguments for "relief" from the finding of contempt is remotely persuasive, the motion (Dkt. No. 269) will be denied.

B.   <u>Vacating the Preliminary Injunction Based on the First</u>

Circuit's Reasoning.

After taking the very action forbidden by the preliminary injunction, Defendants have filed a motion to vacate the preliminary injunction based on the April 1, 2013, decision of the First Circuit affirming the injunction.  (Dkt. No. 277.)  In its decision, the First Circuit held:

> The district court did not commit clear error in concluding that—given the conflicting testimony of experts as to German law and the lack of evidence as to the location of BI's stock certificates—there was a possibility that ADI could enforce its judgment against BI in Germany, but no possibility of enforcement in Austria should the merger be completed and BAG's assets transferred to Austria. The court thus did not err in finding that ADI had demonstrated BAG's merger would cause it irreparable harm. Similarly, the court did not err in concluding that ADI had demonstrated that in the absence of a freeze on defendants' assets, ADI would suffer irreparable harm, since the court could not otherwise assure that assets would remain available to satisfy ADI's judgment against BI.

AngioDynamics, 711 F.3d at 252.

In this motion, Defendants argue that the court must vacate the preliminary injunction and conduct proceedings to determine, at this stage, exactly what the actual challenges might be that Plaintiff would confront if it obtained a

judgment against Defendants (specifically, against BAG) and attempted to enforce that judgment in Germany against this now-Austrian corporation.  The court bears this obligation, Defendants say, because Defendants have provided new evidence on certain issues -- for example, the location of some stock certificates -- referred to in the First Circuit's decision on appeal.

The short answer to this argument is that, even assuming that the evidence might be pertinent, no sufficient new evidence has been proffered by Defendants to merit any reconsideration.  For example, the record still contains no authoritative evidence on where the stock certificates were located at the commencement of this action.

Defendants point to the affidavit of Defendant Neuberger as supposed proof that the stock certificates are located in Germany.  However, a reading of the affidavit reveals that all Defendant Neuberger actually states in his deposition is that he "personally recall[s] seeing those original share certificates in Germany . . . in November 2000."  (Dkt. No. 277-2, Neuberger Aff. ¶ 2.)  Neuberger opines that there would be no reason to send the stock

certificates to the United States.  He also testifies that he saw the certificates in Germany years after the public offering, but he does "not recall the precise year or the circumstances."  (Id.)  This declaration, which was available to the court when it made the contempt finding, does not remotely show that the "judgment is void" or demonstrate any other reason that justifies the "extraordinary relief" that is only granted sparingly under Fed. R. Civ. P. 60(b)(4) or (6).  Karak, 288 F.3d at 19.

Additionally, while Defendants have provided voluminous submissions on the content of German law, nothing definitively refutes Plaintiff's argument that enforcement of an American judgment against a German corporation in Germany is, in the proper circumstances, possible.  Even Defendants' attorney conceded that there was "no question" that the judgment Plaintiff obtained in New York in a separate case would not be enforced in Austria, while there was a "very remote" chance of enforcement in Germany.  (Dkt. No. 142, Tr. Sept. 17 Hr'g 75: 9-12; 76:6-7.)  Morever, the stronger evidence confirms that attempting to enforce an American judgment in Germany against an Austrian corporation

with no significant identified assets in Germany would present Plaintiff with as difficult a challenge as the impossible task it would face in enforcing the judgment in Austria.

In sum, Defendants have offered no new evidence, and no compelling argument, justifying allowance of their motion to vacate the preliminary injunction.  For this reason, Defendants' Motion to Vacate Preliminary Injunction Based on the Reasoning of the First Circuit's April 1, 2013 Decision (Dkt. No. 277) will be denied.

C.   <u>Recusal</u>.

Defendants have filed a Motion for Recusal or Disqualification pursuant to 28 U.S.C. § 455(a).

As the First Circuit has recently observed, 28 U.S.C. § 455(a) requires recusal based on "the existence of facts that would prompt a reasonable question in the mind of a well-informed person about the judge's capacity for impartiality in the course of the trial and its preliminaries."  <u>In re Bulger</u>, 710 F.3d 42, 46 (1st Cir. 2013).  Application of this standard requires care to "prevent parties from too easily obtaining the

disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." Id. at 47 (quoting In re Allied-Signal Inc., 891 F.2d 967, 970 (1st Cir. 1989)).

In this legal landscape, a few basic facts are relevant. Apart from this litigation, the undersigned has had no contact with the individual Defendant Neuberger at any time, or any connection of any kind with any of the corporate Defendants, Plaintiff, the witnesses, or anyone connected to this case. Defendants do not suggest otherwise.

Defendants' only asserted basis for recusal is rooted in their unhappiness in the way the court has conducted portions of the hearings and particularly the court's comments following Defendants' defiance of the injunction. It is well established that "the general rule is that remarks a judge makes in the course of ongoing judicial proceedings, remarks that are in the nature of reactions to what the judge has observed, do not warrant disqualification." Charles Gardner Geyh, Fed. Judicial Ctr., Judicial Disqualification: An Analysis of Federal Law

31 (2d ed. 2010).  "[Parties are] entitled to an impartial
judge; [they are] not entitled to an ingenuous one."  Logue
v. Dore, 103 F.3d 1040, 1046 (1st Cir. 1997).

It is also black-letter law that opinions formed by a
judge about the parties before him or her, formed during the
course of the litigation can only rarely provide the basis
of a motion for recusal.  Liteky v. United States, 510 U.S.
540, 555-56 (1994).  "[O]pinions formed by the judge on the
basis of facts introduced or events occurring in the course
of the current proceedings . . . do not constitute a basis
for a bias or partiality motion unless they display a deep-
seated favoritism or antagonism that would make fair
judgment impossible."  Id. at 555.

This limitation on recusal is obvious.  A litigant
cannot behave badly, then point to the judge's disapproval
of its misconduct, even intense and strongly worded
disapproval, as a basis to remove him or her.

It is true that the type of deep-seated antagonism that
requires recusal can, in extreme circumstances, be evidenced
by a judge's oral comments.  However, "judicial remarks
during the course of a trial that are critical or

disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Id. Remarks that do not establish partiality include "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration -- even a stern and short-tempered judge's ordinary efforts at courtroom administration -- remain immune." Id.

When a court is faced with allegations of partiality toward a party, the First Circuit has counseled that the record must be read as a whole instead of focusing on isolated incidents. United States v. Espinal-Almeida, 699 F.3d 588, 607 (1st Cir. 2012). It is certainly true that the brazenness of Defendants' contumacy struck the court as extraordinary, and some of their counsel's arguments to justify this conduct as childish and patently deficient. The court used strong language to express its opinions, but that was all.

Two things about the relations between court and

counsel are important to emphasize.  First, although the court was impatient with some of counsel's arguments and disgusted by Defendants' misconduct, there was no personal abuse of counsel.  No voice was raised; the court used strong words but delivered them dispassionately.

Second, Defendants' attorney acknowledged that the court's frustration was understandable.  (Dkt. No. 233, Tr. Apr. 4 Hearing 35:19-22 ("I understand that you are upset about it.  Frankly if I was in your shoes, I would be upset about it too.").)  He also conceded that the First Circuit likely held a similar opinion of his client's conduct. (Id. 37:13-16 ("I recognize that the First Circuit's decision is a clear indication that it was also very unhappy with the conduct of my client in completing this merger.").)

In the end, the First Circuit has said it best.

> [J]udging is all about making judgments,
> obviously.  And human nature being what it is,
> those tasked with making some of the hardest calls
> imaginable may, quite understandably, develop
> strong feelings about the cases they work on.  So
> while they must avoid even the appearance of
> partiality, even when bias or prejudice does not
> exist, we do not expect trial judges to act like
> unemotional cyborgs of sci-fi fame. That is why
> problems with the views they form in slogging
> through cases typically do not provide 'a sound

-28-

basis either for required recusal or for directing
that a different judge be assigned on remand.'

<u>Candelario del Moral v. UBS Financial Services Inc. P.R.</u>,

699 F.3d 93, 106 (1st Cir. 2012) (quoting <u>Hull v. Mun. San</u>

<u>Juan</u>, 356 F.3d 98, 104 (1st Cir. 2004) (internal citations

omitted).

There is simply no basis for recusal here.[7]

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Amended Motion

for Relief from Contempt Order (Dkt. No. 269), Defendants'

Motion to Vacate Preliminary Injunction (Dkt. No. 277), and

Defendants' Motion for Recusal (Dkt. No. 274) are all hereby

DENIED.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge

---

[7] In Act III, scene iv, of <u>Hamlet</u> the Danish prince recommends to his mother that she "lay not that flattering unction to your soul.  That not your trespass but my madness speaks."  Defendants might do well to consider this advice.